T.C. Memo. 1997-437

UNITED STATES TAX COURT

ANTHONY G. AND SHIRLEY A. OLBRES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27160-93.                    Filed September 25, 1997.

<u>Edward DeFranceschi</u>, for petitioners.

<u>Ronald F. Hood</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined the following defi-

ciencies in, and additions to, petitioners' Federal income tax:

| | | Additions to Tax | | | |
| | | Sec. | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(b)(1)(A)[1] | 6653(b)(1)(B) | 6653(b)(1) | 6661(a) |
| 1986 | $120,353 | $87,750 | * | -- | $29,250 |
| 1987 | 336,457 | 251,203 | ** | -- | 83,734 |
| 1988 | 122,457 | -- | -- | $91,843 | 30,614 |

\* 50 percent of the interest due on $117,000.
\*\* 50 percent of the interest due on $334,937.

---

[1] All section references are to the Internal Revenue Code in
effect for the years at issue.  All Rule references are to the
Tax Court Rules of Practice and Procedure.

The issues remaining for decision are:[2]

(1)  Are petitioners liable for each of the years 1986, 1987, and 1988 for the additions to tax for fraud under section 6653(b)(1)?  We hold that they are for 1986 and 1987 and that they are for 1988 to the extent stated herein.

(2)  Did respondent make a computational error in determining petitioners' unreported gross receipts for 1988?  We hold that respondent did.

(3)  Are petitioners liable for each of the years 1986, 1987, and 1988 for the addition to tax for a substantial understatement of income tax under section 6661(a)?  We hold that they are for 1986 and 1987 and that they are for 1988 to the extent stated herein.

## FINDINGS OF FACT[3]

Some of the facts have been stipulated and are so found.

---

[2]  Petitioners have conceded all of the determinations in the notice of deficiency (notice) for the years at issue except the issues stated, an issue as to whether the respective periods of limitations for 1986 and 1988 have expired, and computational issues for 1988 involving a disallowed medical expense deduction and self-employment tax.  Our resolution of the period of limitations issue for 1986 and 1988 flows automatically from our findings with respect to the issue regarding the additions to tax for fraud for those years.  See sec. 6501(c)(1).  Our resolution of the computational issues for 1988 flows automatically from petitioners' concessions on other issues and our finding with respect to the issue regarding an alleged computational error involving petitioners' unreported gross receipts for that year.

[3]  Unless otherwise indicated or needed for clarity, our Findings of Fact and Opinion pertain to 1986, 1987, and 1988, the years at issue.

Petitioners resided in Hampton, New Hampshire, at the time the petition was filed.

Petitioners, who were married on June 22, 1968, have three children, Tamara C. Olbres, Jason A. Olbres, and Tyler M. Olbres. Before petitioners were married, petitioner Anthony G. Olbres (Mr. Olbres) attended the Center for Creative Studies in Detroit, Michigan, from which he received a bachelor's degree in transportation design and training in industrial design, and petitioner Shirley A. Olbres (Ms. Olbres) completed three years of college at the University of Vermont, where she studied German and liberal arts. Shortly after petitioners were married, Ms. Olbres took classes in psychology and sociology at a community college. Petitioners have not taken any courses at the college level in accounting or business.

Petitioners' Activities

Around 1974, petitioners started a business interchangeably called Design Consultants, A.G. Olbres Design Consultants, and A.G. Olbres Design, in which they engaged in designing and fabricating trade show exhibits (exhibits). (We shall refer to the business in which petitioners engaged as Design Consultants.)

On April 18, 1988, petitioners incorporated Design Consultants under the name White Star Design, Inc. (White Star), and the following numbers of shares of its no-par common stock were issued to the individuals indicated: Mr. Olbres held 55 shares, Ms. Olbres held 35 shares, and Manuel L. Olbres held 10 shares.

On May 4, 1988, White Star elected to be taxed as an S corporation.  At the time White Star was formed, the following individuals were appointed to the offices indicated:  Mr. Olbres as president, Ms. Olbres as treasurer, and Manuel L. Olbres as vice president.

In addition to designing and fabricating the exhibits, Design Consultants and/or White Star arranged for certain businesses to perform auxiliary services (auxiliary services) for their clients including, inter alia, transporting the exhibits, setting up the exhibits, hiring on-site personnel at trade shows, electrical work, floral arranging, and telephone services. During 1986, Design Consultants and/or White Star used, inter alia, Greyhound Exposition Services (Greyhound) for certain auxiliary services, and during 1986, 1987, and 1988, they used, inter alia, Mayflower Transit, Inc. (Mayflower), to perform those services.

From sometime in 1983 through the years at issue, Design Consultants was located in North Berwick, Maine.  By around 1985, it had approximately 20 to 24 employees.  Mr. Olbres' responsibilities for Design Consultants consisted of designing, ordering materials for, supervising the setting up of, selling, and pricing the exhibits.  At all relevant times, Ms. Olbres, who spent time caring for petitioners' children, did all of the bookkeeping for Design Consultants and White Star.

During 1986 and 1987, clients of Design Consultants paid it

$800,461[4] and \$1,865,499, respectively, as payment for services rendered, products sold, and/or certain of the auxiliary services. During 1988, clients of Design Consultants and White Star paid them a total of \$1,018,772 as payment for services rendered, products sold, and/or certain of the auxiliary services. When Design Consultants and/or White Star arranged to have certain businesses perform the auxiliary services for their clients, at least some of those businesses, such as Greyhound for 1986 and Mayflower for 1986, 1987, and 1988, paid them commissions. Greyhound and Mayflower paid Design Consultants and/or White Star commissions that equaled approximately 15 percent of the payments received by Greyhound and/or Mayflower from clients of Design Consultants and/or White Star. Design Consultants and/or White Star billed their clients for any auxiliary services that those clients received from various businesses, including Greyhound and Mayflower; those clients paid Design Consultants and/or White Star for those services billed; and Design Consultants and/or White Star paid those businesses for the auxiliary services that they provided to clients of Design Consultants and/or White Star. During 1986, Design Consultants received commissions of \$4,725 from Greyhound, and during 1986, 1987, and 1988, Design Consultants and/or White Star received commissions of \$58,464, \$96,671, and \$70,060, respectively, from Mayflower. (We shall sometimes

---

[4] All dollar amounts are rounded to the nearest dollar.

refer collectively to payments from clients of Design Consultants and/or White Star and commissions from Greyhound and Mayflower as Design Consultants' and/or White Star's receipts.)

During 1986, 1987, and 1988, petitioners maintained the following personal and business bank accounts (bank accounts) at Indian Head Bank and Trust Co. (Indian Head), Kennebunk Savings Bank (Kennebunk), and The Exeter Banking Company (Exeter):[5]

| Bank | Type of Account | Name of Account | Account Number |
|------|-----------------|-----------------|----------------|
| Indian Head | Checking | A.G. Olbres Design, Design Consultants | 281-01619 |
| Indian Head | Checking | Anthony G. Olbres and Shirley A. Olbres | 351-00369 |
| Indian Head | Savings | A.G. Olbres, Design Consultants | 30-002583-0 |
| Indian Head | Savings | Anthony G. Olbres and Shirley A. Olbres | 015-000289-7 |
| Kennebunk | Checking | A.G. Olbres, Gary Rohm, d/b/a Design Consultants | 33-802452 |
| Kennebunk | Checking | Design Consultants, A.G. Olbres | 56-868352 |
| Kennebunk | Savings | Anthony G. Olbres | 20-004393 |
| Exeter | Checking | Seabrook Properties, Shirley Olbres | 201-474-7300 |

(We shall refer to (1) Indian Head checking account number 281-01619 as the Indian Head business checking account, (2) Indian

---

[5] The names of Indian Head and Exeter were changed sometime after the years at issue.

Head checking account number 351-00369 as the Indian Head personal checking account, (3) Indian Head savings account number 30-002583-0 as the Indian Head business savings account, (4) Indian Head savings account number 015-000289-7 as the Indian Head personal savings account, (5) Kennebunk checking account number 33-802452 as the Kennebunk Olbres-Rohm business checking account, (6) Kennebunk checking account number 56-868352 as the Kennebunk business checking account, (7) Kennebunk savings account number 20-004393 as the Kennebunk personal savings account, and (8) Exeter checking account number 201-474-7300 as the Seabrook Properties account.)

On April 22, 1988, petitioners closed the Indian Head business savings account, which had a closing balance of $464,409. On the same date, petitioners opened another business savings account at Indian Head, account number 015-002290-3, under the name "A.G. Olbres Design Consultants; Anthony or Shirley Olbres" (1988 Indian Head business savings account) into which they deposited $464,409.[6]

During 1988, petitioners also maintained the following business bank accounts at Kennebunk:

---

[6] The parties stipulated that the 1988 Indian Head business savings account was a checking account. However, that stipulation is contrary to the record in this case, which establishes, and we have found, that that account is a savings account. We may, and we shall in this instance, disregard stipulations between the parties when the stipulations are clearly contrary to the facts established by record. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989).

| Bank | Type of Account | Name of Account | Account Number |
|------|------|------|------|
| Kennebunk | Checking | White Star Design, Inc. | 66-910252 |
| Kennebunk | Checking | White Star Design, Inc., Exhibit Design and Fabrication | 66-110152 |

(We shall refer to (1) Kennebunk checking account number 66-910252 as the first Kennebunk White Star checking account and (2) Kennebunk checking account number 66-110152 as the second Kennebunk White Star checking account.)

Petitioners deposited Design Consultants' and/or White Star's receipts into the Indian Head business checking account, the Indian Head business savings account, and various other bank accounts that they maintained.[7] Petitioners made the following

---

[7] The parties stipulated that they deposited all "business checks" and receipts from "business clients" into either the Indian Head business checking account or the Indian Head business savings account. We construe the references in those stipulations to "business checks" and to receipts from "business clients" to mean receipts of Design Consultants and/or White Star other than commissions that they received from businesses that provided the auxiliary services. As we construe those stipulations, they are contrary to the record in this case. Even if our construction of those stipulations were incorrect in that the references therein refer to all receipts of Design Consultants and/or White Star, including commissions that they received, those stipulations nonetheless would be contrary to the record in this case. That record shows, and we have found, that petitioners deposited both Design Consultants' and/or White Star's receipts from their clients and commission receipts into bank accounts in addition to the Indian Head business checking account and the Indian Head business savings account. To illustrate, petitioners deposited two checks from Numismatic Professionals, Inc., into the Kennebunk personal savings account. By way of

(continued...)

total deposits into the following bank accounts during the years indicated:

| Name of Account | 1986 | 1987 | 1988 |
|---|---|---|---|
| Indian Head business checking account | $758,179 | $1,240,902 | $664,062 |
| Indian Head personal checking account | 124,619 | 222,746 | 269,549 |
| Indian Head business savings account | 233,269 | 845,199 | 132,249 |
| Indian Head personal savings account | -- | -- | 38,354 |
| Kennebunk Olbres-Rohm business checking account | 2,551 | 9,989 | 66,512 |
| Kennebunk business checking account | 87,225 | 163,850 | 74,370 |
| Kennebunk personal savings account | 9,043 | 9,701 | 22,173 |
| Seabrook Properties account | 94,063 | 144,671 | 77,039 |
| 1988 Indian Head business savings account | -- | -- | 710,921 |
| First Kennebunk White Star checking account | -- | -- | 9,085 |

_____

[7](...continued)
further illustration, petitioners deposited commissions received from Greyhound during 1986 into not only the Indian Head business savings account, but also the Seabrook Properties account. We may, and we shall in this instance, disregard stipulations between the parties where the stipulations are clearly contrary to facts established by the record. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. at 195.

| Name of Account | 1986 | 1987 | 1988 |
|---|---|---|---|
| Second Kennebunk White Star checking account | -- | -- | 70,950 |
| Total | 1,308,949 | 2,637,058 | 2,135,264 |

Petitioners treated the funds in the Indian Head business savings account and the 1988 Indian Head business savings account over which they had complete control as their own funds, and they used those funds for personal expenditures.

Ms. Olbres maintained cash receipts journals (cash receipts journals), cash disbursements journals (cash disbursements journals), petty cash journals (petty cash journals), and payroll journals (payroll journals) for Design Consultants and/or White Star. Around 1975, Wilson P. Dennett (Mr. Dennett), an accountant retained by petitioners, created the format for, inter alia, the cash receipts journals and showed Ms. Olbres how to maintain those journals.

When Design Consultants and/or White Star billed a client for services rendered, Mr. Olbres wrote a draft of an invoice, and Susan Rubenstein, who worked for petitioners at Design Consultants and White Star as a secretary from December 1986 through June 1988, and/or another member of the office staff typed that invoice and mailed it to the client. Three copies of each invoice were made, one of which was kept in the office of Design Consultants and/or White Star, one of which was sent to Ms. Olbres at petitioners' house, and one of which was sent to

the client who was being billed. The invoices requested that payment be remitted to petitioners' home address.

Ms. Olbres maintained invoice logs (invoice logs) in which she kept track of the invoices that Design Consultants and/or White Star sent to their clients and the amounts that those clients paid on those invoices. Design Consultants and/or White Star did not send invoices to Greyhound and/or Mayflower,[8] and, consequently, commissions received from those businesses were not recorded in the invoice logs.[9] Ms. Olbres brought copies of portions of the invoice logs to petitioners' house. She periodically destroyed those copies.

Petitioners opened the Indian Head business savings account around 1983. They deposited certain of Design Consultants' and/or White Star's receipts into that account, and Ms. Olbres recorded those deposits in a bank passbook for that account. Ms.

---

[8]  The record is not clear about whether Design Consultants and/or White Star sent invoices to other businesses that provided auxiliary services to the clients of Design Consultants and/or White Star.

[9]  The parties stipulated that all of the deposits made into the Indian Head business savings account were recorded not only in a bank passbook for that account, but also in the invoice logs. That stipulation insofar as it relates to the invoice logs is contrary to the record in this case. That record shows, and we have found, that Design Consultants and/or White Star did not send invoices to Greyhound and/or Mayflower and that commissions that were paid to Design Consultants and/or White Star by those businesses were not recorded in the invoice logs. We may, and we shall in this instance, disregard stipulations between the parties where the stipulations are clearly contrary to facts established by the record. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. at 195.

Olbres recorded in the cash receipts journals only those Design Consultants' and/or White Star's receipts that petitioners deposited into the Indian Head business checking account, and she did not record in the cash receipts journals their respective receipts that petitioners deposited into the Indian Head business savings account or any other account. She recorded in the invoice logs only those Design Consultants' and/or White Star's receipts for which clients were sent invoices.

Petitioners deposited only two checks from Mayflower, one received in 1986 and one received in 1988, into the Indian Head business checking account. They deposited all of the other checks received from Mayflower during the years at issue, as well as all of the checks received from Greyhound during 1986, into other bank accounts that they maintained, including the Indian Head business savings account. Consequently, the cash receipts journals omitted all of the amounts received by Design Consultants and/or White Star from Greyhound during 1986 and most of the amounts that Design Consultants and/or White Star received from Mayflower during the years at issue.

As a result of Ms. Olbres' bookkeeping practices, a person examining the cash receipts journals and no other written records of Design Consultants and/or White Star would have no idea that Design Consultants and/or White Star received income in addition to their respective receipts that petitioners deposited into the Indian Head business checking account. Moreover, a person

examining both the cash receipts journals and the invoice logs that Ms. Olbres maintained would have no idea that Design Consultants and/or White Star received commissions in the amounts paid to them by Greyhound and/or Mayflower.

During 1986, 1987, and 1988, petitioners leased (1) certain property in North Berwick, Maine (North Berwick property), to Kitchen Tech for which they received rental income of $2,925, $3,890, and $1,480, respectively, and (2) certain property in Seabrook, New Hampshire (Seabrook property), to Johnson Matthey, Inc. (Johnson Matthey), for which they received $46,969, $48,000, and $12,000, respectively. During 1988, petitioners also received rental income of $900 from Traditional Wood Works, Inc., and $28,000 from White Star for the use of a building on the North Berwick property that had previously been used by Design Consultants. Petitioners deposited at least a portion of the rental income that they received from Johnson Matthey into the Seabrook Properties account.

Petitioners' Accountant, Mr. Dennett

Mr. Dennett's Professional
Background, Experience, and Practice

During 1960, Mr. Dennett, who at the time was a public accountant, began his accounting practice. Around the late 1970's, he became qualified as a certified public accountant (C.P.A.) in New Hampshire, after having unsuccessfully taken the C.P.A. examination approximately seven times.

Beginning in 1960, until the time of Mr. Dennett's death in November 1991, Mr. Dennett's wife, Margaret Dennett (Ms. Dennett), worked at Mr. Dennett's office. Ms. Dennett's duties included preparing some less complicated tax returns for Mr. Dennett's clients, preparing payroll returns, checking and proofreading typing, entering data into Mr. Dennett's office computer, and ensuring that written materials that clients provided to Mr. Dennett's office for use in the preparation of their tax returns were returned to those clients upon completion of that return preparation.

At least during the 1980's, Joyce Wildes (Ms. Wildes) also worked in Mr. Dennett's office and assisted him by preparing tax returns. During each of the years at issue, Mr. Dennett's office prepared approximately 300 tax returns.

When a client retained Mr. Dennett for tax return preparation, Mr. Dennett generally followed one of the following practices: (1) Mr. Dennett met with the client, asked for and received information with respect to the client's tax return,[10] and prepared a draft tax return while the client waited at Mr. Dennett's office; (2) Mr. Dennett reviewed written materials that the client left at his office, asked any questions that he had based on his review of those written materials by telephoning the

_____

[10] It is not clear from the record whether Mr. Dennett's clients generally provided him with oral and/or written information with respect to their tax returns.

client or at a client meeting, and prepared the client's tax return based on the written materials provided by that client and any supplemental information that Mr. Dennett received from the client in answer to his questions; or (3) Mr. Dennett met with the client, received written materials from the client at that meeting, and, as a result of the meeting and the written materials, prepared a draft of the client's tax return either at that meeting or at a later time.

In addition to his accounting practice, Mr. Dennett was elected annually for approximately 33 years to the position of school treasurer for the town of Hampton. For 22 of those years, Mr. Dennett was elected to the position of treasurer (town treasurer) for the town of Hampton. Throughout the period from 1981 until around 1991, Mr. Dennett, as town treasurer, worked with Janet C. LaPlante (Ms. LaPlante). Ms. LaPlante, who had graduated from high school and attended two years of college, was the head bookkeeper for the town of Hampton during that period and thereafter until around 1993. Throughout the period during which Ms. LaPlante was head bookkeeper for the town of Hampton, she was not an accountant.

As town treasurer, Mr. Dennett was required to prepare and provide Ms. LaPlante with monthly treasurer's reports (treasurer's reports). Those reports, which were due on the tenth of every month, reflected the total amounts received and paid by the town of Hampton during the month covered by the report and the

aggregate amounts received and paid by the town of Hampton during the year to the date of the report. It was Ms. LaPlante's responsibility to make sure that the books that she and her staff maintained for the town of Hampton agreed with the figures in the treasurer's reports. In addition, Ms. LaPlante sent all cash or checks received on behalf of the town of Hampton to Mr. Dennett, and Mr. Dennett, after reviewing what he received, deposited the cash and checks into the appropriate bank account(s) of the town of Hampton.

In a "letter of comments and recommendations" dated January 31, 1990, and prepared by Plodzik & Sanderson, an accounting firm retained by the town of Hampton to conduct audits of the town, that firm made the following comments about Ms. LaPlante: "While * * * [she] does attempt to maintain some of the required records, we do not feel that she possesses the necessary skills to assume responsibility over all bookkeeping and record-keeping functions".

#### Mr. Dennett's Relationship with Petitioners

Petitioners first retained Mr. Dennett, whose office was located near petitioners' house, around 1975, and he prepared their joint U.S. individual income tax returns (returns) for the taxable years 1976 through 1988. Throughout the years during which petitioners retained Mr. Dennett, he also prepared unaudited personal and business financial statements for petitioners, which petitioners used, inter alia, in attempting to borrow money.

In connection with Mr. Dennett's preparation of petitioners' return for each of the years at issue, petitioners visited Mr. Dennett's office in order to provide him with certain information. When Mr. Dennett had finished preparing petitioners' return for each of those years based on the information that petitioners provided to him, his office telephoned petitioners to inform them that their return was ready. Petitioners then went to his office and were given the return that Mr. Dennett had prepared, as well as a cover sheet, which, inter alia, summarized the contents of the return, they signed that return, and they paid Mr. Dennett's bill. Each of petitioners' returns for the years at issue was thereafter filed. At all relevant times, both petitioners knew that it would be unlawful to sign a false return.

Petitioners did not provide Mr. Dennett with complete and accurate information from which he could have prepared a correct return for petitioners for each of the years at issue.

Mr. Dennett prepared (1) unaudited projected business financial statements (unaudited projected business financial statements) for Design Consultants for 1986 and for White Star for 1988 that were dated June 26, 1986, and June 23, 1988, respectively, (2) drafts of two unaudited statements of income and expenditures for Design Consultants (draft, unaudited statement of income and expenditures), one for 1986 and one for 1987, and (3) unaudited personal financial statements for petitioners

that were dated August 31, 1988 (August 31, 1988 unaudited personal financial statements).  In preparing the foregoing statements for petitioners, Mr. Olbres gave Mr. Dennett the figures to include, and Mr. Dennett placed those figures in the proper places and made the necessary calculations.

The unaudited projected business financial statements for Design Consultants for 1986 contained the following caveats:

> We have compiled the accompanying projected balance sheet, statements of income, retained earnings, and changes in financial position of A.G. Olbres Design, as of December 31, 1986, and for the year ending, in accordance with standards established by the American Institute of Certified Public Accountants.

> The accompanying projection and this report was pre- pared for the purpose of selling the business and should not be used for any other purpose.

> A compilation is limited to presenting in the form of a projection information that is the representation of management and does not include evaluation of the support for the assumptions underlying the projection. We have not examined the projection and, accordingly do not express an opinion or any other form of assurance on the accompanying or assumptions. * * * We have no responsibility to update this report for events and circumstances occurring after the date of this report.

Virtually identical caveats except for the second paragraph quoted above appeared in a letter addressed to Anthony G. Olbres DBA White Star Design, Inc., that was part of the unaudited projected business financial statements for White Star for 1988. The unaudited projected financial statements for Design Consul- tants for 1986 reflected projected gross receipts in an amount that is almost twice as large as the gross receipts for Design

Consultants reported by petitioners in Schedule C, Profit or

(Loss) from Business or Profession (Schedule C), of their 1986

return (1986 Schedule C) and the unaudited projected financial

statements for White Star for 1988 reflected projected gross

receipts in an amount that is almost four times as large as the

gross receipts reported by White Star in its 1988 Form 1120S,

U.S. Income Tax Return for an S Corporation (1988 Form 1120S).

The draft, unaudited statements of income and expenditures

for Design Consultants for 1986 and 1987 reflected gross receipts

and net income in amounts that are identical to the respective

amounts of gross receipts and net income reported in petitioners'

1986 Schedule C and Schedule C of petitioners' 1987 return.

The August 31, 1988 unaudited personal financial statements

contained the following caveats:

> We have compiled the accompanying statement of finan-
> cial condition of Anthony G. and Shirley A. Olbres as
> of August 31, 1988, in accordance with standards estab-
> lished by the American Institute of Certified Public
> Accountants.
>
> A compilation is limited to presenting in the form of
> financial statements information that is the represen-
> tation of the individuals whose financial statements
> are presented.  We have not audited or reviewed the
> accompanying statement of financial condition and,
> accordingly, do not express an opinion or other form of
> assurance on it.

The August 31, 1988 unaudited personal financial statements did

not include information with respect to petitioners' checking

accounts at Indian Head or their bank accounts at Kennebunk.  Nor

did those statements include information with respect to peti-

tioners' stockholdings in White Star.

Certain Bank Transactions of
Petitioners During the Years at Issue

Certain Loans for Which Petitioners Applied

On August 11, 1986, petitioners signed a residential loan application (1986 loan application) in which they applied for a loan of $297,500 from The Berlin City Bank to purchase certain property located in North Conway, New Hampshire (North Conway property).  Petitioners indicated in that application that the purchase price of the North Conway property was $350,000, that they intended to make a cash downpayment on that purchase of $52,500, and that their monthly gross income was $185,000.

In an attachment to the 1986 loan application entitled "Notes of Financial Status, Anthony G. and Shirley A. Olbres, Hampton, NH 03842", petitioners listed the following four bank accounts:  (1) The Indian Head business savings account, (2) the Indian Head personal savings account, (3) Exeter bank account number 14 747 3 01,[11] and (4) the Kennebunk personal savings account.  In another attachment to the 1986 loan application, petitioners indicated that they received gross monthly income of $4,000 and net monthly income of $841 from the lease of the Seabrook property to Johnson Matthey and that they made monthly mortgage and real property tax payments of $3,109 and $50,

---

[11] Records relating to Exeter bank account number 14 747 3 01 are not part of the record.

respectively, on that property. Also attached to the 1986 loan application were the unaudited projected financial statements for Design Consultants for 1986 that indicated that the gross receipts of Design Consultants for the remainder of 1986 was projected to be $1,350,000.

On June 28, 1988, petitioners signed an application for a $277,200 loan from an undisclosed source with respect to the purchase for a total of $308,000 of two units in Cranmore Condominiums in North Conway, New Hampshire. Petitioners made a downpayment of $30,800 on those purchases.

Certain Automobiles Purchased by Petitioners

During April 1985, petitioners secured a loan from Indian Head in the amount of $33,345 for the purchase of a 1984 Porsche. Petitioners made monthly payments of $926 on that loan until April 7, 1988, when they made a final payment of approximately $1,900.

In March 1986, petitioners secured a loan of $12,278 from Indian Head for the purchase of a 1986 Chevrolet Blazer. Petitioners made monthly payments of $404 on that loan until on or about June 5, 1987, when they made a final payment of approximately $7,700.

On May 28, 1987, Ms. Olbres used a treasurer's check in the amount of $28,650 that she purchased with part of a $48,650 withdrawal from the Indian Head business savings account to buy a 1984 Mercedes Benz.

On June 18, 1987, Ms. Olbres withdrew $157,500 in cash from the Indian Head business savings account in order to purchase a treasurer's check in the amount of $157,500 for the purchase of a 1987 Rolls Royce Corniche (Rolls Royce).

On August 3, 1987, Ms. Olbres withdrew $24,750 in cash from the Indian Head business savings account in order to purchase a treasurer's check for $24,750 for the purchase of a 1987 Range Rover.

Certain Payments With Respect to Brokerage
Accounts Maintained by Petitioners

On or about June 4, 1987, Mr. Olbres, as custodian for each of petitioners' sons under the Uniform Gifts to Minors Act of New Hampshire (custodian), purchased shares in the Advantage Growth Fund for $10,006 for each of two brokerage accounts at Advest, Inc. (Advest), that he maintained as their custodian.  He paid for those shares by using a treasurer's check that Ms. Olbres had purchased on June 10, 1987, with $20,012 in cash that she had withdrawn from the Indian Head business savings account.

On September 8, 1987, petitioners purchased shares in the Advantage Growth Fund for $50,004 and shares in the Templeton Global Fund, Inc., for $50,008 for their brokerage account at Advest.  They paid for those shares by using two treasurer's checks that Ms. Olbres had purchased on September 4, 1987, with $100,012 that she had withdrawn from the Indian Head business savings account.

On or about October 27, 1987, petitioners purchased shares in the Advantage Growth Fund for $20,005 for their brokerage account at Advest. They paid for those shares by using a treasurer's check that Ms. Olbres had purchased on November 3, 1987, with part of a $45,000 withdrawal that she had made from the Indian Head business savings account.

Certain Yachts Purchased by Petitioners

In March 1988, petitioners agreed to purchase for $172,210 a 1988 Pace yacht (Pace yacht) from Marina Harbor Corp. (Marina Harbor). In that connection, on March 16, 1988, when the balance of the Indian Head personal checking account was $3,958, Ms. Olbres wrote a check for $16,000 from that account that was payable to Marina Harbor as a downpayment for the purchase of the Pace yacht. On March 17, 1988, petitioners withdrew $16,700 from the Indian Head business savings account and deposited $16,000 into the Indian Head personal checking account. In June 1988, Mr. Olbres entered into a retail installment sales agreement to finance $133,000 of the purchase price of the Pace yacht. On June 17, 1988, Ms. Olbres withdrew $23,210 from the 1988 Indian Head business savings account and purchased a treasurer's check for $23,210 payable to Marina Harbor for a further downpayment on the Pace yacht.

In October 1988, petitioners traded in the Pace yacht in order to purchase for $1,002,752 a 54-foot Bertram yacht (Bertram yacht) from Norwood Marine, Inc. (Norwood Marine). Petitioners

made a deposit of $85,000 on the purchase of the Bertram yacht by using a check drawn on their Indian Head personal checking account. The bill of sale for the Bertram yacht indicated that the buyer was "SHIRLEY A. OLBRES, Trustee, Under a Trust Agreement Dated: October 19, 1988, for the Benefit of: The H.N. Nautical Trust (Tamara C. Olbres, Tyler M. Olbres, Jason A. Olbres)". On October 26, 1988, Ms. Olbres withdrew $120,000 from the 1988 Indian Head business savings account and purchased a treasurer's check in the amount of $145,325, payable to Norwood Marine, for a further downpayment on the Bertram yacht. In addition, two receipts from Norwood Marine indicated that two checks in the amounts of $535,383 and $3,500 were received from Security Marine Creditcorp, which provided financing to petitioners for the purchase of the Bertram yacht.

Petitioners' Returns

Petitioners filed returns for 1986, 1987, and 1988 that they signed and that Mr. Dennett signed as return preparer. In petitioners' Schedules C for those years, petitioners reported gross receipts and net profits of Design Consultants, as follows:

| Year | Gross Receipts | Net Profits |
|------|----------------|-------------|
| 1986 | $740,990 | $75,784 |
| 1987 | 1,235,069 | 83,502 |
| 1988 | 340,675 | 26,061 |

On line four of Schedule C of petitioners' 1988 return (1988 Schedule C), petitioners reported $49,525 of "Other income", which was compensation that White Star paid to Mr. Olbres during

1988 (1988 White Star compensation).

In Schedule B (Interest and Dividend Income) of petitioners' returns for the years at issue, petitioners reported interest income from, inter alia, the Indian Head business savings account.

In Schedule E (Supplemental Income Schedule) of petitioners' returns (Schedule E) for the years at issue, petitioners reported the following amounts of rental income with respect to the properties indicated:

| Year | Seabrook Property | North Berwick Property |
|------|-------------------|------------------------|
| 1986 | $21,600 | * |
| 1987 | 30,000 | -0- |
| 1988 | 6,000 | $28,000 |

* Although petitioners received $2,925 of rental income from Kitchen Tech for the North Berwick property, that property was not listed as rental property in petitioners' 1986 return.

During 1989, White Star filed its 1988 Form 1120S in which it reported gross receipts of $506,336 and ordinary income of $773. In Schedule E of their 1988 return, petitioners reported $773 of income with respect to White Star.

In April 1989, petitioners filed Form 1045 (Application for Tentative Refund) in which they claimed refunds based on an alleged net operating loss of $52,136 that they carried back from 1988 to 1985, 1986, and 1987. A large portion of that loss was attributable to an alleged casualty loss of $52,002 that petitioners claimed with respect to a fire at the Seabrook property

that occurred on March 13, 1988, and a Schedule E loss of $28,195, which consisted of a net loss of $28,968 with respect to petitioners' rental properties and the $773 of income that petitioners reported with respect to White Star.  Petitioners received refunds for 1985, 1986, and 1987 in the amounts of $48, $3,353, and $2,919, respectively.

Respondent's Examination of Petitioners' Returns

Based on a prime lead referral that was generated because an Internal Revenue Service employee observed a Rolls Royce that, after further investigation, was determined to belong to petitioners, Revenue Agent Karen Lyle (Ms. Lyle) was assigned to examine petitioners' 1987 return.  Thereafter, Ms. Lyle sent a letter (appointment letter) to Mr. Dennett, who, on August 29, 1989, had filed Form 2848, Power of Attorney and Declaration of Representative (Form 2848), authorizing him to represent petitioners with respect to their taxable year 1987.  In the appointment letter, Ms. Lyle requested books, records, savings account passbooks, and various other documents relating to petitioners' taxable year 1987.  However, Ms. Lyle never conducted a field visit with petitioners because Revenue Agent Leonard R. Kaply (Mr. Kaply) replaced her.

On September 25, 1989, Mr. Kaply met (September 1989 meeting) with petitioners, Mr. Dennett, and Ms. Wildes.  At that meeting, petitioners told Mr. Kaply about the types of written materials that Ms. Olbres maintained during 1987 for Design

Consultants, including the cash receipts journal, the cash disbursements journal, the petty cash journal, and the payroll journal for that year, but they failed to mention the invoice log. At the September 1989 meeting, petitioners also informed Mr. Kaply about the existence of the Indian Head business savings account and told him that all of the deposits made into that account were transferred from the Indian Head business checking account. Petitioners did not inform Mr. Kaply at the September 1989 meeting that they deposited checks received by Design Consultants directly into the Indian Head business savings account.

At the September 1989 meeting, petitioners and Mr. Dennett provided Mr. Kaply with some of the documents requested in the appointment letter that Ms. Lyle had sent to Mr. Dennett. They did not provide Mr. Kaply with the cash receipts journal for 1987 or bank statements for the Indian Head business savings account, the Kennebunk personal savings account, and the Seabrook Proper- ties account. In fact, Mr. Kaply was not even aware at the September 1989 meeting that the Seabrook Properties account existed. He subsequently learned of the existence of that account during the course of his examination of petitioners' taxable year 1987 when he found that petitioners deposited checks written from the Seabrook Properties account into their Indian Head personal checking account.

At the September 1989 meeting, Mr. Kaply asked Mr. Dennett

how he prepared petitioners' 1987 return. Mr. Dennett gave him a six-page summary (1987 summary) that covered at least certain expenses of Design Consultants for 1987 and certain income, including $30,000 of rental income from the Seabrook property, and certain expenses of petitioners, including all expenses with respect to the Seabrook property, for that year. The 1987 summary did not include information with respect to Design Consultants' receipts for 1987. All of the income amounts and virtually all of the expense amounts that were included in the 1987 summary were reported in petitioners' 1987 return. Ms. Olbres indicated to Mr. Kaply at the September 1989 meeting that she gave Mr. Dennett the 1987 summary in connection with the preparation of petitioners' 1987 return.

After the September 1989 meeting, Mr. Kaply prepared a memorandum covering the answers that petitioners and Mr. Dennett provided to his questions during that meeting. In that memorandum, Mr. Kaply indicated that petitioners' 1987 return was prepared by Mr. Dennett from "books and schedules" prepared by Ms. Olbres. Mr. Kaply's reference to "books and schedules" was to the 1987 summary that Ms. Olbres provided to Mr. Dennett.

After the September 1989 meeting, Mr. Dennett wanted to make certain that the 1987 return that he had prepared and that was filed for petitioners was accurate. In this connection, petitioners provided Mr. Dennett with certain written materials relating to 1987 that he did not have previously, including the

cash receipts journal for that year.  Mr. Dennett and Ms. Wildes used those materials to reconstruct another 1987 return for petitioners that was not filed (reconstructed 1987 return).  The amount of gross receipts reflected in Schedule C of petitioners' reconstructed 1987 return was virtually identical to (1) the amount of gross receipts reflected in the cash receipts journal for 1987 and (2) the amount of gross receipts reflected in Schedule C of the return that petitioners filed for that year.

On September 26, 1989, the day after the September 1989 meeting, Mr. Kaply submitted Form 4564, Information Document Request (IDR), to Mr. Dennett requesting the information that he had requested at that meeting, as well as additional information with respect to certain of the written materials that petitioners had provided to him at that meeting.  In the IDR, Mr. Kaply requested, inter alia, the following:  (1) Information with respect to the Indian Head personal checking account, including the source of the funds deposited into that account, and (2) an explanation of the source of the money deposited into petition-ers' savings accounts.  Approximately one month after sending the IDR to Mr. Dennett, Mr. Kaply had not received any information with respect to those two inquiries, and he decided to summons petitioners' records from Indian Head, Kennebunk, and Hampton Co-operative Bank.[12]  Thereafter, when Mr. Kaply learned of the

---

[12]  The record does not contain information with respect to what
(continued...)

existence of the Seabrook Properties account, he summonsed the bank records with respect to that account.

When Mr. Kaply received the bank records for the Indian Head business savings account, he discovered that, contrary to what petitioners had told him at the September 1989 meeting, petitioners had deposited directly into that account checks that they had received from clients of Design Consultants. Mr. Kaply then decided to do an analysis under the bank deposits method to determine whether petitioners had unreported income for 1987, and, if so, in what amount. Based on that analysis and his investigation, Mr. Kaply determined that petitioners had approximately $750,000 of unreported income for 1987.

On February 14, 1990, Mr. Kaply telephoned Mr. Dennett (February 1990 telephone call) to schedule another meeting with petitioners. Mr. Dennett informed Mr. Kaply during the February 1990 telephone call that petitioners wanted Mr. Dennett to meet alone with Mr. Kaply and that they did not intend to attend future meetings. When Mr. Kaply advised Mr. Dennett during the February 1990 telephone call about the amount of income that he had determined petitioners failed to report for 1987, Mr. Dennett told Mr. Kaply that he would contact petitioners about meeting with Mr. Kaply. During the February 1990 telephone call, Mr.

_____

[12](...continued)
bank accounts, if any, were maintained by petitioners at Hampton Co-operative Bank. The record shows only that petitioners obtained two mortgage loans from that bank.

Dennett disclosed to Mr. Kaply that Mr. Olbres had told him that there might be a problem involving unreported income with respect to petitioners' 1987 return.

In February 1990, Mr. Kaply and Jim Bircree, who was Mr. Kaply's manager, met (February 1990 meeting) with Mr. Dennett and Ms. Wildes about petitioners' 1987 return that was being examined. Although Mr. Dennett had telephoned Mr. Kaply a couple of days after the February 1990 telephone call to inform him that petitioners planned to attend the February 1990 meeting, petitioners did not appear at that meeting. In anticipation of the February 1990 meeting, Mr. Kaply prepared a list of questions with respect to the Indian Head business savings account and two of the accounts maintained by petitioners at Kennebunk because he thought that some of the checks deposited into those accounts might represent income not reported by petitioners for 1987. Mr. Dennett informed Mr. Kaply at the February 1990 meeting that he had no knowledge about whether any of the deposits into those accounts constituted income to petitioners. Immediately after the February 1990 meeting, Mr. Kaply enlarged his examination of petitioners' taxable year 1987 to include their taxable year 1988.

A few days after the February 1990 meeting, Mr. Dennett telephoned Mr. Kaply and informed him that he was no longer authorized to represent petitioners in connection with Mr. Kaply's examination of petitioners' taxable year 1987. Approxi-

mately one week thereafter, George D. Coupounas (Mr. Coupounas) telephoned Mr. Kaply to advise him that on February 22, 1990, petitioners had executed Forms 2848 authorizing Mr. Coupounas to represent petitioners not only with respect to their taxable year 1987 that was being examined by Mr. Kaply, but also with respect to their taxable years 1986 and 1988, and those forms were sent to Mr. Kaply.

On April 24, 1990, Mr. Kaply and Norman Murphy (Mr. Murphy), who was Mr. Kaply's acting manager, met (April 1990 meeting) with Mr. Coupounas about petitioners' returns for 1987 and 1988 that were being examined. At that meeting, Mr. Kaply asked Mr. Coupounas questions about the Indian Head business savings account and two of the accounts at Kennebunk, which were similar to the questions that he had asked Mr. Dennett at the February 1990 meeting. Mr. Coupounas informed Mr. Kaply and Mr. Murphy at the April 1990 meeting that he would answer Mr. Kaply's questions only if Mr. Murphy promised not to refer petitioners' case to respondent's Criminal Investigation Division (CID). When Mr. Murphy declined to make any such promise, Mr. Coupounas indicated that he was terminating the April 1990 meeting.

Shortly after the April 1990 meeting, Mr. Kaply turned petitioners' audit over to CID, and that division began to investigate not only petitioners' taxable years 1987 and 1988, but also their taxable year 1986. Respondent's special agent, Don Cote (Mr. Cote), was assigned to the criminal investigation

of those years, and Mr. Kaply assisted him in that investigation. As part of Mr. Cote's criminal investigation, Mr. Cote and Mr. Kaply met in July 1990 (July 1990 meeting) with Mr. Dennett and Ms. Wildes. At that meeting, Mr. Cote asked Mr. Dennett questions regarding, inter alia, how Mr. Dennett prepared petitioners' returns for 1986, 1987, and 1988. Mr. Dennett indicated that he met with Ms. Olbres shortly before petitioners' return for each of the years at issue was due, she verbally related to him the figures to be used in each of those returns, and gave him the 1987 summary in connection with his preparation of their 1987 return. Mr. Dennett placed those figures on the appropriate lines in each such return and made the computations called for by each of those returns. Mr. Dennett informed Mr. Cote and Mr. Kaply at the July 1990 meeting that petitioners never provided him with any bank statements or bank records in connection with his preparation of petitioners' 1986, 1987, and 1988 returns.

Notice of Deficiency

On September 23, 1993, respondent issued a notice to petitioners for 1986, 1987, and 1988 and determined that they had unreported income for those years in the amounts of $246,948, $791,927, and $399,606, respectively. Virtually all of the unreported income for 1986 and all of the unreported income for 1987 that respondent determined in the notice consisted of certain gross receipts of Design Consultants and certain rental income paid to petitioners. In addition to certain gross re-

ceipts of Design Consultants, the unreported income for 1988 that respondent determined in the notice included (1) the $49,525 of 1988 White Star compensation and (2) income resulting from the disallowance by respondent of the net operating loss that petitioners claimed for that year. With respect to petitioners' claimed net operating loss, two of the components that petitioners claim gave rise to that loss were a casualty loss resulting from a fire at the Seabrook property on March 13, 1988, and a Schedule E loss of $28,195 that petitioners claimed in their 1988 return. With respect to petitioners' claimed casualty loss, respondent determined that for 1988 petitioners had a gain of $7,415, and not a loss, resulting from the fire at the Seabrook property because the proceeds that petitioners received from their insurance company as a result of that fire exceeded the basis of the portion of the Seabrook property that the fire destroyed. With respect to petitioners' claimed Schedule E loss of $28,195, respondent determined that for 1988 petitioners had a Schedule E gain of $60,930, and not a loss, because for that year they had unreported rental income of $9,315, they overstated their deductions with respect to their rental property by $32,531, and their income with respect to their S corporation White Star was understated by $53,230.

Respondent's determinations in the notice of Design Consultants' unreported gross receipts were based on the bank deposits method analysis conducted by Mr. Kaply. As is reflected in the

explanation of Design Consultants' unreported gross receipts for
1988 that is contained in the notice (1988 explanation), respon-
dent determined the total amount that petitioners deposited into
their bank accounts for that year and the portion of those
deposits that constituted gross receipts of Design Consultants.
In determining the portion of petitioners' total bank deposits
for 1988 that constituted gross receipts of Design Consultants,
respondent reduced the total amount of petitioners' bank deposits
that respondent determined for that year by what respondent
determined to be petitioners' deposits from nontaxable sources,
transfers that petitioners made between their bank accounts, the
total amount of petitioners' rental income,[13] and "Wages"
con-sisting of the $49,525 of 1988 White Star compensation.
Respondent determined that the balance of petitioners' bank
deposits for 1988 constituted gross receipts of Design Consul-
tants for that year.  Respondent then reduced the gross receipts
of Design Consultants that respondent determined for 1988 by
"Income per return" in order to determine Design Consultants'
unreported gross receipts for that year.  Respondent did not

---

[13] Respondent first added the amount of rental income that
respondent determined was not deposited into petitioners' bank
accounts during 1988 to the total deposits that respondent
determined petitioners made into those accounts during that year
and that included petitioners' rental income for 1988 which
respondent determined petitioners had deposited into their bank
accounts.  Respondent then reduced such total bank deposits
during 1988, as determined by respondent, by, inter alia, the
total amount of rental income that respondent determined peti-
tioners had for that year.

include in that "Income per return" figure the $49,525 of 1988 White Star compensation that petitioners reported on line four of their 1988 Schedule C as "Other income". Consequently, respondent determined that for 1988 petitioners had $228,119 of unreported gross receipts of Design Consultants.

Respondent also determined in the notice that petitioners are entitled to certain deductions for 1987 and 1988 that they did not claim in their returns for those years and that petitioners are not entitled to certain of the cost of goods sold and deductions that they claimed in their 1986, 1987, and 1988 returns totaling $102,980, $102,705, and $146,641, respectively. With respect to respondent's determinations disallowing, inter alia, certain of the cost of goods sold and deductions that petitioners claimed, respondent's representatives obtained from petitioners and reviewed oral and/or written information regarding at least certain of those items about which respondent had questions.

Petitioners' Criminal Trial and Conviction

On April 14, 1993, a grand jury indicted petitioners on three counts of violating section 7201 by willfully attempting to evade and defeat a large part of the income tax due and owing by them to the United States for 1986, 1987, and 1988. Petitioners were tried in the U.S. District Court for the District of New Hampshire (District Court) on January 24, 1994, and a jury found petitioners guilty of violating section 7201 for 1987 and acquit-

ted them of violating section 7201 for 1986 and 1988 (jury verdict).

After the jury verdict, petitioners filed a motion for judgment of acquittal with respect to the guilty jury verdict for 1987. On September 30, 1994, the presiding judge issued a memorandum order in which he granted that motion, and a judgment of acquittal was entered.

On July 26, 1995, the Court of Appeals for the First Circuit reversed the judgment entered by the District Court and reinstated petitioners' criminal conviction under section 7201 for 1987. Petitioners petitioned the U.S. Supreme Court for a writ of certiorari. That petition was denied on or about November 29, 1995, and petitioners' conviction under section 7201 for 1987 became final.

OPINION

Respondent bears the burden of proof on the fraud issue, and that burden must be satisfied by clear and convincing evidence. Sec. 7454(a); Rule 142(b). Petitioners bear the burden of proving that respondent's deficiency determinations and those under section 6661(a) are erroneous.[14] Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

---

[14] Petitioners contend on brief that, because they are not liable for the additions to tax for fraud, the respective periods of limitations for 1986 and 1988 have expired. See sec. 6501(a), (c)(1). We find below that respondent has established fraud for 1986 and 1988. Consequently, the respective periods of limitations for each of those years have not expired. Sec. 6501(c)(1).

Both petitioners and respondent rely on testimonial and documentary evidence to support their respective positions in this case. Mr. Olbres and Ms. Olbres testified at trial. Although they were able to recollect, understand, and recount certain details about the multimillion dollar business which they controlled during the years at issue, they had difficulty in remembering, comprehending, and/or recounting details about that business that do not appear to support their position in this case. We found Mr. Olbres' testimony to be questionable, implausible, and/or vague in certain material respects. We found Ms. Olbres' testimony to be questionable, evasive, vague, implausible, and/or conclusory in certain material respects. Under such circumstances, we are not required to, and we generally do not, rely on the testimony of either petitioner. See National Fireworks v. Commissioner, 243 F.2d 295, 297 (1st Cir. 1957), affg. T.C. Memo. 1956-1; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

Ms. LaPlante testified for petitioners. While we have no reason to question her credibility based on our observation of her demeanor, for the reasons discussed below, we are unwilling to rely on her testimony to support petitioners' position in this case.

Ms. Dennett and Mr. Kaply also were witnesses at trial. We found Ms. Dennett's testimony to be credible. We also found Mr. Kaply's testimony to be credible, and we rely on him to establish

facts relating to his examination of petitioners' returns for the years at issue, including what Mr. Dennett, who unfortunately died prior to trial, told him during the course of that examination.

Issues on Which Respondent Has the Burden of
Proof--Additions to Tax Under Section 6653(b)(1)

For 1986 and 1987, section 6653(b)(1)(A) imposes an addition to tax equal to 75 percent of the portion of an underpayment that is attributable to fraud, and section 6653(b)(1)(B) imposes an addition to tax equal to 50 percent of the interest due on that portion of the underpayment. For 1988, section 6653(b)(1) imposes an addition to tax equal to 75 percent of the portion of the underpayment attributable to fraud. For purposes of the foregoing provisions, section 6653(b)(2) provides that if respondent establishes that any portion of an underpayment is due to fraud, the entire underpayment is treated as attributable to fraud, unless the taxpayer proves that some portion of the underpayment is not due to fraud.

In order for the additions to tax for fraud to be imposed, respondent must prove by clear and convincing evidence that an underpayment exists and that some portion of that underpayment is due to fraud. Sec. 7454(a); Rule 142(b); Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992). Petitioners concede the underpayment determined by respondent for each of the years at issue except for that portion of the underpayment for 1988 that is

attributable to a computational error involving the 1988 White Star compensation that petitioners contend respondent made in determining the unreported gross receipts of Design Consultants for that year (claimed 1988 computational error). In light of petitioners' concessions, we find that an underpayment exists for each of the years at issue.

Before turning to the question of fraudulent intent, we shall address petitioners' contention regarding the amount of the underpayment for 1988 insofar as it relates to the 1988 White Star compensation. Respondent used the 1988 White Star compensation as a factor in determining under the bank deposits method the unreported gross receipts of Design Consultants for 1988. In addition, respondent made a determination in the notice that petitioners have unreported income for 1988 of $49,525 attributable to the 1988 White Star compensation. In petitioners' closing statement at the conclusion of trial, they contended that for 1988 there was a computational error in the bank deposits method analysis used by respondent to determine Design Consultants' unreported gross receipts. In an objection to a finding of fact proposed by respondent, petitioners state the following on brief: "Further, the adjustment for 'Compensation, White Star Design, Inc.'; adjustment '1 p' for 1988 (Resp. Ex. F) is in error. The '49,525' is reported on Petitioners 1988 1040, Schedule C Part I, line 5, [sic] other income 49,525 (Resp. Ex E)." As we construe petitioners' position at trial and on brief,

petitioners contend that respondent made a computational error in applying the bank deposits method for 1988 in that, in determining the unreported gross receipts of Design Consultants under that method, respondent failed to reduce the bank deposits that respondent determined were Design Consultants' gross receipts for that year by the $49,525 of 1988 White Star compensation that petitioners reported in their 1988 Schedule C.  We agree that respondent made a computational error in applying the bank deposits method to determine the amount of Design Consultants' unreported gross receipts for 1988.

Respondent's determinations in the notice of Design Consultants' unreported gross receipts were based on the bank deposits method analysis conducted by Mr. Kaply.  As is reflected in the 1988 explanation, respondent determined the total amount that petitioners deposited into their bank accounts for that year and the portion of those deposits that constituted gross receipts of Design Consultants.  In determining the portion of petitioners' total bank deposits for 1988 that constituted gross receipts of Design Consultants, respondent reduced the total amount of petitioners' bank deposits that respondent determined for that year by what respondent determined to be petitioners' deposits from nontaxable sources, transfers that petitioners made between their bank accounts, the total amount of petitioners' rental income, and "Wages" consisting of the $49,525 of 1988 White Star compensation.  Respondent determined that the balance of peti-

tioners' bank deposits for 1988 constituted gross receipts of Design Consultants for that year. Respondent then reduced the gross receipts of Design Consultants that respondent determined for 1988 by "Income per return" in order to determine Design Consultants' unreported gross receipts for that year. Respondent did not include in that "Income per return" figure the $49,525 of 1988 White Star compensation that petitioners reported on line four of their 1988 Schedule C as "Other income". We find that respondent made a computational error in applying the bank deposits method to determine Design Consultants' unreported gross receipts for 1988 (1988 computational error) in that respondent should have included the 1988 White Star compensation in that "Income per return" figure.[15] Accordingly, we find that the unreported gross receipts of Design Consultants for 1988 is $178,594, and not $228,119. We further find that the amount of the deficiency, and therefore the amount of the underpayment, for 1988 (revised 1988 underpayment), see sec. 6653(c)(1), should be reduced in the Rule 155 computation in order to correct the 1988 computational error.

We shall now turn to the question of fraudulent intent. To prove that an underpayment is attributable to the fraudulent intent of the taxpayer, respondent must prove that the taxpayer

[15] However, we sustain respondent's separate determination that petitioners have unreported income for 1988 of $49,525 attributable to the 1988 White Star compensation.

intended to evade taxes that he or she believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Parks v. Commissioner, 94 T.C. 654, 661 (1990). The existence of fraudulent intent is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Although fraudulent intent is never presumed, it may be established by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Rowlee v. Commissioner, supra at 1123; Otsuki v. Commissioner, 53 T.C. 96, 106 (1969).

The courts have established a number of badges of fraud from which fraudulent intent may be inferred. Those badges include: (1) Substantial and consistent understatement of income, (2) failure to maintain adequate records, (3) incomplete and erroneous information provided to tax return preparer or book-keeper, (4) destruction of books and records, (5) implausible explanation of behavior, (6) lack of credibility of the tax-payer's testimony, and (7) failure to cooperate with tax authori-ties. See Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Toussaint v. Commissioner,

743 F.2d 309, 312 (5th Cir. 1984), affg. T.C. Memo. 1984-25; Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172; Powell v. Granquist, 252 F.2d 56, 59 (9th Cir. 1958); Parks v. Commissioner, supra at 664-665. The mere failure to report income is not sufficient to establish fraud. Petzoldt v. Commissioner, supra at 700.

Petitioners' Taxable Year 1987

Respondent determined that $334,937 of petitioners' under-payment for 1987 is attributable to fraud. At the conclusion of the trial in this case, petitioners conceded the amount of the underpayment for that year, and they also conceded that they are estopped from denying fraud for 1987 because of their conviction for criminal tax evasion under section 7201 for that year. See Manzoli v. Commissioner, 904 F.2d 101, 105 (1st Cir. 1990), affg. T.C. Memo. 1988-299, supplemented by T.C. Memo. 1989-94; DiLeo v. Commissioner, 96 T.C. 858, 885-886 (1991), affd. 959 F.2d 16 (2d Cir. 1992). Petitioners reiterate those concessions on brief.

Petitioners nonetheless contend, inconsistently in our view, that "the amount of the deficiency and the resulting civil penalty may be litigated in subsequent civil proceedings." To support that contention, petitioners make the following conclusory argument on brief: "Because of the arbitrary nature [sic] the Respondent's determination of the portion of the deficiency attributable to disallowed expenses no fraud penalty in any of the years in question can be attributable to that

portion of the deficiency."  Petitioners presented no evidence showing that the underpayment for 1987 that is attributable to those expenses is not due to fraud.  On the record before us, we find that petitioners have failed to show, as they must under section 6653(b)(2), that the portion of the underpayment for 1987 that is attributable to the deductions which respondent disallowed is not due to fraud.

Based on our review of the entire record before us, we find that petitioners are liable for 1987 for the additions to tax under section 6653(b)(1) with respect to the portion of the underpayment for that year that respondent determined is attributable to fraud.

### Petitioners' Taxable Years 1986 and 1988

Respondent contends that $117,000 of the underpayment for 1986 (1986 underpayment) and all of the underpayment for 1988 that were determined in the notice are attributable to fraud.  We have found a revised 1988 underpayment, and our discussion addresses the parties' contentions regarding respondent's determinations under section 6653(b)(1) with respect to the 1986 underpayment and the revised 1988 underpayment.

Petitioners contend that the 1986 underpayment and the revised 1988 underpayment are not due to fraud, but are due to errors in petitioners' returns for 1986 and 1988 that were made by their accountant Mr. Dennett on whom they relied and to whom they provided complete written materials from which he could have

prepared correct returns for those years, but did not.  Petition-
ers are willing to share some responsibility for what they claim
are Mr. Dennett's errors in preparing their 1986 and 1988 re-
turns.  For example, they admit that the cash receipts journals
that they claim to have given to Mr. Dennett in connection with
his preparation of those returns may have been misleading because
those journals did not reflect all of Design Consultants' and/or
White Star's receipts.  However, they maintain that any errors in
those journals, which Ms. Olbres was responsible for maintaining,
would have been due to her negligence, and not due to her intent
or the intent of Mr. Olbres to commit fraud.

We turn first to petitioners' contention that Ms. Olbres may
have been negligent, but not fraudulent, in maintaining the cash
receipts journals.  Petitioners claim, among other things, that
any errors in maintaining those journals arose because Ms. Olbres
was inexperienced and untrained in maintaining the cash receipts
journals and because she had certain unidentified distractions.
For example, Ms. Olbres claims that she did not understand that
the title "cash receipts journal" was no longer accurate when she
stopped recording all of Design Consultants' and/or White Star's
receipts in the cash receipts journals that she maintained and
instead recorded in those journals only their respective receipts
that were deposited into the Indian Head business checking
account.  On the record before us, we are unwilling to accept
petitioners' explanations.  Although Ms. Olbres took no college

courses in business or accounting, around 1975 Mr. Dennett created the format for, inter alia, the cash receipts journals for petitioners and showed Ms. Olbres how to maintain those journals. We are incredulous that Ms. Olbres did not understand the meaning of the title "cash receipts journal". On the record before us, we reject petitioners' explanation that it was Ms. Olbres' negligence, and not petitioners' fraudulent intent, that was responsible for the 1986 underpayment and the revised 1988 underpayment.

We turn now to petitioners' claim that although they provided complete written information to Mr. Dennett from which he could have prepared accurate returns for the years in question, he made errors in those returns, which resulted in the 1986 underpayment and the revised 1988 underpayment. To support their claim, petitioners rely on their testimony. On the record before us, we are unwilling to accept petitioners' explanation at trial of the reasons why the returns in question reflected the 1986 underpayment and the revised 1988 underpayment. By way of illustration of the questions we have about the reliability of Ms. Olbres' testimony, she testified about the length of the appointments she had with Mr. Dennett in order to have him prepare petitioners' returns for the years at issue. Specifically, she indicated at trial that she made an appointment with Mr. Dennett, she went to each of those appointments, she "[sat] down for a minute" with Mr. Dennett to review some of petition-

ers' deductions, and she then left his office. Ms. Olbres' testimony about the length of her appointments with Mr. Dennett in order to have him prepare petitioners' returns at issue is contradicted by other evidence in the record, including the testimony of Mr. Olbres and Ms. Dennett. Mr. Olbres testified, inter alia, that, in order to have Mr. Dennett prepare petitioners' returns for the years at issue, Ms. Olbres and he "would go to * * * [Mr. Dennett's] office, we would sit down, he would start a piece of paper and a tape and he'd [sic] ask questions" of petitioners. Ms. Dennett testified that she reviewed Mr. Dennett's appointment book relating to his meetings with petitioners in connection with his preparation of their returns for the years at issue and that that book showed that Mr. Dennett met with petitioners for approximately three hours regarding his return preparation for petitioners for each of those years.

By way of further illustration of the questions we have about the reliability of Ms. Olbres' testimony and to illustrate similar questions we have about Mr. Olbres' testimony, each testified that, in connection with Mr. Dennett's preparation of the returns in question, they provided Mr. Dennett with complete written materials from which he could have prepared accurate returns. That testimony is contradicted by other evidence in the record. Mr. Kaply testified that Mr. Dennett informed him that, in preparing petitioners' return for each of the years at issue, Mr. Dennett met with Ms. Olbres shortly before each such return

was due, she verbally related to him the figures to be used in each of those returns, and gave him the 1987 summary in connection with his preparation of their 1987 return. Mr. Dennett placed those figures on the appropriate lines in each of those returns and made the computations called for by each such return. Mr. Kaply further testified that Mr. Dennett advised him that petitioners never provided him with any bank statements or bank records in connection with his preparation of any of petitioners' returns for the years at issue.

Ms. Dennett's testimony supports Mr. Kaply's testimony regarding what, if any, materials petitioners provided to Mr. Dennett in connection with his preparation of their return for each of the years at issue. She testified that one of her duties in Mr. Dennett's accounting office was to ensure that written materials that clients provided to Mr. Dennett's office for use in the preparation of their returns were returned to those clients upon completion of that return preparation. Ms. Dennett further testified that she never saw written materials, such as ledgers, bank statements, and invoice logs belonging to petitioners and relating to the years at issue, which had to be returned to them.

The preparation of the reconstructed 1987 return by Mr. Dennett and Ms. Wildes also calls into question the testimony of Ms. Olbres and Mr. Olbres that they gave complete written materials to Mr. Dennett from which he could have prepared accurate

returns for the years at issue. Indeed, petitioners did not even provide to Mr. Dennett's office complete written materials from which that office could have reconstructed an accurate return for 1987 after the IRS began its examination of that taxable year of petitioners. In this connection, to assist Mr. Dennett and Ms. Wildes in their reconstruction of petitioners' 1987 return, petitioners gave Mr. Dennett certain written materials relating to 1987 that he did not have previously, including the cash receipts journal for that year, which petitioners admit did not reflect all of Design Consultants' receipts for that year. Petitioners do not dispute that Mr. Dennett and Ms. Wildes accurately reconstructed petitioners' 1987 return based on the written materials that they provided to Mr. Dennett's office. However, the amount of gross receipts reflected in Schedule C of petitioners' reconstructed 1987 return was virtually identical to (1) the amount of gross receipts reflected in the cash receipts journal for 1987 and (2) the amount of gross receipts reflected in Schedule C of the return that petitioners filed for that year, both of which substantially understated Design Consultants' receipts for 1987.

Even assuming arguendo that, in connection with Mr. Dennett's preparation of their returns for the years at issue, petitioners had provided him with the cash receipts journals and the invoice logs, which are the only records that would have shown the receipts of Design Consultants and/or White Star,

petitioners' income from Design Consultants and/or White Star for 1986 and 1988 would still have been understated. We have found that those written materials did not reflect all of the receipts of Design Consultants and/or White Star in that (1) the cash receipts journals omitted, inter alia, all of the amounts that Design Consultants and/or White Star received from Greyhound during 1986 and most of the amounts that Design Consultants and/or White Star received from Mayflower during the years at issue and (2) the invoice logs[16] did not reflect any receipts from Greyhound and/or Mayflower.

Moreover, even assuming arguendo that, in connection with Mr. Dennett's preparation of their returns for the years at issue, petitioners had provided him with the cash receipts journals and the invoice logs, their rental income for 1986 and 1988 would still have been understated. We have found that petitioners understated their rental income in each of the returns at issue. Petitioners do not claim that their rental income was reflected in the cash receipts journals, the invoice logs, or any other written records, and it appears that none of their rental income was reflected in any such records. Consequently, Mr. Dennett must have obtained information regarding

---

[16] The original invoice logs for the years at issue are not part of the record. Ms. Olbres claimed at trial that she did not know where they were. Ms. Olbres periodically destroyed the copies of portions of the invoice logs for the years at issue that she had brought to petitioners' house.

petitioners' rental income orally from petitioners and from the 1987 summary with respect to their 1987 return. The 1987 summary reflected rental income of $30,000 from the Seabrook property, and Mr. Dennett included that income in petitioners' 1987 return. However, petitioners' rental income for that year is $51,890. Mr. Dennett also included rental income totaling $21,600 and $34,000 in petitioners' 1986 and 1988 Schedules E, respectively. However, petitioners' rental income for those years is $49,894 and $42,380, respectively. It strains credulity that Mr. Dennett would have made errors in all three of petitioners' returns for the years at issue by showing amounts of rental income that understated the rental income that petitioners' received and that were different from the amounts that petitioners provided to him for those years.

Petitioners also contend that the amount of income reflected in each of the returns at issue and the complexity of those returns demonstrate that petitioners must have provided complete written materials to Mr. Dennett in order for him to have prepared those returns. We disagree. Although petitioners' returns required certain calculations that appear to be complex (e.g., depreciation and passive activity loss limitation), the information that Mr. Dennett needed to perform those calculations (e.g., the cost of petitioners' depreciable property and rental and other passive activity losses sustained by petitioners) was information that he had to have obtained from petitioners.

In further support of their contention that Mr. Dennett made errors in preparing petitioners' returns for the years at issue, petitioners offered the testimony of Ms. LaPlante. Throughout the period 1981 through around 1991, Ms. LaPlante, as head bookkeeper for the town of Hampton, worked with Mr. Dennett in his capacity as town treasurer. Ms. LaPlante testified that, during the late 1980's, she noticed that Mr. Dennett made a number of mistakes in the treasurer's reports that he was required to prepare and provide to her and that he was three months delinquent in providing her with one of those reports. From 1981 through around 1993, the period during which Ms. LaPlante, who had graduated from high school and attended two years of college, was head bookkeeper for the town of Hampton, she was not an accountant. Moreover, in a "letter of comments and recommendations" dated January 31, 1990, and prepared by Plodzik & Sanderson, an accounting firm retained by the town of Hampton to conduct audits of the town, that firm made the following comments about Ms. LaPlante: "While * * * [she] does attempt to maintain some of the required records, we do not feel that she possesses the necessary skills to assume responsibility over all bookkeeping and record-keeping functions". On the record before us, we are unwilling to find from Ms. LaPlante's testimony that Mr. Dennett made mistakes in his treasurer's reports during the 1980's, nor are we willing to infer from her testimony that Mr.

Dennett made errors in his preparation of petitioners' returns for the years at issue.

In order to provide additional support for their contention that Mr. Dennett made errors in his preparation of their returns for the years at issue, petitioners assert that Mr. Dennett should have known that their income in each such return was understated because he prepared (1) the unaudited projected financial statements for Design Consultants for 1986, which reflected projected gross receipts in an amount that is almost twice as large as the gross receipts reported by petitioners in their 1986 Schedule C, and (2) the unaudited projected financial statements for White Star for 1988, which reflected projected gross receipts in an amount that is almost four times as large as those reported by White Star in its 1988 Form 1120S.[17]  Petitioners further contend that the August 31, 1988 unaudited personal financial statements reflected their assets on a "complete and accurate basis" and that those assets could not have been accumulated with the income that they reported in their returns for the years at issue.

---

[17]  Although Mr. Olbres asked Mr. Dennett to prepare both personal and business unaudited financial statements throughout the approximate 14-year period during which petitioners retained Mr. Dennett, Mr. Olbres testified at trial that he did not know the meaning of the term "unaudited".  We are incredulous that Mr. Olbres, who was in control of a multimillion dollar business and who had many unaudited financial statements prepared for petitioners and their business, did not know the meaning of that term.

With respect to the unaudited projected financial statements for Design Consultants for 1986, those statements were merely projections made by petitioners that included caveats indicating that the figures in those statements were based on representations of petitioners, Mr. Dennett took no responsibility for their accuracy, and he did not take responsibility to update those figures. Mr. Dennett would have had no way of knowing whether or not the projections in those financial statements proved true at the end of that year, other than based on information that petitioners provided to him. In this connection, it is noteworthy that Mr. Dennett prepared a draft, unaudited statement of income and expenditures for 1986 for Design Consultants based on information provided to him by petitioners and that, unlike the unaudited projected financial statements for Design Consultants for 1986, that statement reflected gross receipts and net income in amounts identical to the gross receipts and net income reported in petitioners' 1986 Schedule C.

With respect to the unaudited projected financial statements for White Star for 1988, as with the unaudited projected financial statements for Design Consultants for 1986, those statements were merely projections made by petitioners that included caveats that were virtually identical (except for one paragraph not pertinent here) to those in the unaudited projected financial statements for Design Consultants for 1986. Mr. Dennett would

have had no way of knowing whether or not the projections proved true, other than based on information that petitioners provided to him.

The August 31, 1988 unaudited personal financial statements contained caveats indicating that the figures in those statements were based on representations of petitioners and that Mr. Dennett took no responsibility for their accuracy.[18]  We do not believe that Mr. Dennett should have had in mind those unaudited, partial-year financial statements of petitioners at the time he was preparing their return for 1988.  Nor do we believe that those unaudited statements should have caused Mr. Dennett to know that the income reported by petitioners in their 1988 return was understated or that petitioners could not have accumulated the assets reflected in those unaudited statements with the income that they reported in their returns for the years at issue.

On the record before us, we find that petitioners have not come forward with credible and reliable evidence to contradict respondent's clear and convincing evidence establishing the following badges of fraud from which petitioners' fraudulent intent may be inferred for 1986 and 1988:  (1)(a) Petitioners

---

[18]  The Aug. 31, 1988 unaudited personal financial statements did not, as petitioners contend, provide information on a "complete and accurate basis" about petitioners' assets because those statements did not include information with respect to petition- ers' checking accounts at Indian Head or their bank accounts at Kennebunk, nor did they include information with respect to petitioners' stockholdings in White Star.

substantially understated the gross receipts of Design Consultants, including commissions received from Greyhound and/or Mayflower, for each of the years 1986, 1987, and 1988, (b) petitioners substantially understated the gross receipts of White Star for the year 1988, and (c) petitioners substantially understated their rental income for each of the years 1986, 1987, and 1988; (2)(a) Ms. Olbres recorded in the cash receipts journals only those Design Consultants' and/or White Star's receipts that petitioners deposited into the Indian Head business checking account, and a person examining those journals and no other written records of Design Consultants and/or White Star would have no idea that Design Consultants and/or White Star received income in addition to their respective receipts that petitioners deposited into the Indian Head business checking account, and (b) a person examining both the cash receipts journals and the invoice logs that Ms. Olbres maintained would have no idea that Design Consultants and/or White Star received commissions in the amounts paid to them by Greyhound and/or Mayflower; (3) petitioners failed to provide Mr. Dennett, their accountant, with complete information from which he could have accurately prepared their 1986, 1987, and 1988 returns; (4) the original invoice logs were not available at trial, and Ms. Olbres periodically destroyed the copies of portions of the invoice logs that she had brought to petitioners' house; (5) the testimony in this case of

each petitioner was in material respects implausible; (6) the testimony of each petitioner was questionable, contradicted by other evidence in the record, and lacked credibility in certain material respects; and (7) petitioners failed to cooperate with respondent's representatives in that, inter alia, (a) they failed to provide information that Mr. Kaply had requested at the September 1989 meeting with respect to certain bank accounts, and, approximately one month later, Mr. Kaply had to summons that information, (b) they incorrectly told Mr. Kaply at the September 1989 meeting that all of the deposits made into the Indian Head business savings account were transferred from the Indian Head business checking account, and (c) they did not disclose the existence of the Seabrook Properties account at the September 1989 meeting.

Based on our examination of the entire record before us, we find that respondent has established by clear and convincing evidence that petitioners intended to evade tax for each of the years 1986 and 1988 that they knew to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes.

Petitioners contend, as they did with respect to 1987, in a conclusory manner and with no support in the record that assuming arguendo that the Court were to find fraudulent intent for 1986 and 1988, the respective portions of the 1986 underpayment and

the revised 1988 underpayment that are attributable to the deductions that respondent disallowed are not due to fraud.  We reject that contention.  On the record before us, we find that petitioners failed to show, as they must under section 6653(b)(2), that the respective portions of the 1986 underpayment and the revised 1988 underpayment that are attributable to the deductions that respondent disallowed are not due to fraud.

Based on the entire record before us, we find that petitioners are liable for the additions to tax under section 6653(b)(1) with respect to the portion of the underpayment for 1986 that respondent determined is attributable to fraud and the revised 1988 underpayment.[19]

Issues on Which Petitioners Have the Burden of Proof

Deficiency Determinations

Petitioners concede the deficiency determination for each of the years at issue except for the portion of the deficiency for 1988 that is attributable to the claimed 1988 computational error.  We have sustained petitioners' position with respect to that claimed error.  Accordingly, we sustain respondent's deficiency determinations for the years at issue except for that portion of the 1988 deficiency that is attributable to the 1988 computational error.

---

[19]  We have considered all of petitioners' arguments not discussed herein, and we find them to be without merit.

Additions to Tax Under Section 6661(a)

Respondent determined that petitioners are liable for the addition to tax under section 6661(a) for each of the years at issue. Petitioners presented no evidence and make no argument about those determinations except for their contention regarding the claimed 1988 computational error, which we have sustained.

Based on the record before us, we find that petitioners have failed to prove that they are not liable for the addition to tax under section 6661(a) for 1986, 1987, and 1988 except to the extent of the portion of the understatement of income tax for 1988 that is attributable to the 1988 computational error. Accordingly, we sustain respondent's determinations under section 6661(a) for those years except to that extent.

To reflect the foregoing,

Decision will be entered

under Rule 155.